The opinion of the Court was delivered by
Wardlaw, A. J.
By the will of Martin Staggers, dated in October, 1822, five slaves, of whom these complainants are two, were bequeathed to William Staggers for life, “ and then after his death to be free, to all intents and purposes, forever.” The land in controversy was by the same clause devised to “William Staggers during his natural life, and at his death to go to the said five negroes aforesaid, to them and their heirs forever.” Another clause directed “ that one thousand dollars should be placed in my brother William Stagger’s hand, to remain there during *96 his natural life, and at his death to be paid to the said colored people aforesaid, share and share alike.”
The appeal brings under consideration the rights of the two complainants, now emancipated by the Constitution of 1865, or by some prior consequence of the late war, to shares of the land and money above mentioned. William Staggers died in August, 1862, unquestionably before emancipation, and to recover anything of what thej^ claim, the complainants must establish their rights in opposition to the representatives of William Staggers, and also to the persons who are heirs, next of kin, and residuary legatees of Martin Staggers.
If the scheme of Martin Staggers was, as the will plainly indicates, that the ñve slaves should be emancipated at or before his brother William’s death, the provisions for them were made in contemplation of their changed condition. The emancipation was a contingency intended to precede the vesting of rights in them, and as it did not take place at or before the termination of the life-estate, the contingent remainders were defeated. (Lenoir vs. Sylvester, 1 Bal. 642.) When Martin Staggers made his will, it is likely that he was not informed of the Act of 1820, (7 Stat. 459, § 31,) passed shortly befóte, which prohibited emancipation except by Act of the Legislature, and that he relied upon his brother William to effect emancipation, under the Act of 1800, (7 Stat. 442, § 7.)
But it is plausible to suggest that Martin Staggers’ will affords an early instance of an attempt, such as afterwards became frequent, to evade the Act of 1820 by conferring substantial'freedom under nominal slavery, and thus the gift to the slaves may be relieved from the effect of precedent contingency. We will, with the haste which the press of business constrains, examine the argument upon which the case of the complainants has been in this Court rested. A summary is this : The African slave was by law ranged *97 under the head of perpetuus inimicus, and was subject to the disabilities of an alien enemy according to the ancient law. An alien enemy might take property, personal, and hold until office found, by which it became forfeited to the sovereign. The restoration of peace with the country of the alien enemy, before office found, discharged the cause of forfeiture. So an African slave might take property for the benefit of himself or his' master, and hold subject to forfeiture to the State upon office found; but his emancipation and investiture with civil rights before office found, (13 Stat. 393,) discharged the cause of forfeiture and rendered indefeasible his title in property previously conveyed to him.
This argument, except the effect of emancipation and civil rights, depends upon the authority of the case of Fable vs. Brown, (2 Hill, Ch. 392.) The opinion there was pronounced by Chancellor Harper, whose extraordinary intellect and profound learning made him, especially in equity, the luminary of our Courts. The ruling of the case and much of its doctrine have been approved, and followed in subsequent cases; but the application to slaves, of the law concerning alien enemies, has always been looked upon by bench and bar as speculation, ingenious, but unsound ; has never been sanctioned in subsequent cases, and has been expressly repudiated more than once. (Carmile vs. Carmile, 2 McM. 470.) On one occasion a contrary theory was propounded by Judge O’Neill, and that declared to have the sanction of the Court of Errors. There never has been any proceeding on the part of the State to declare the forfeiture of any property acquired by a slave, except summary forfeitures under Act of the Legislature, which forbade certain acquisitions by a slave as contrary to public policy. Judge Harper says: "There is no provision by law for an inquisition by which this” (personal property in possession of a slave) "shall be vested in the State;” and if *98 our Act (1787, 5 Stat. 47) of escheats (as forfeitures to the State are there denominated) should be supposed to embrace acquisitions of slaves under the word "otherwise” in its twelfth section, it would be hard to adapt the machinery of that Act (McCaw vs. Galbraith, 7 Rich. 87) to such acquisitions, or to say that the slave was “divested'by operation of law,” when the inquisition required to divest him. could proceed only in case of his having become so divested.
What influence the ancient notions concerning barbarous heathens and alien enemies may have had when African slaves were first taken to Hispaniola, and by what, if any laws, those slaves were at first regulated in any of tbe American colonies, are subjects of disquisition, curious, but, on this occasion, unimportant. There must necessarily have grown up in every English colony, either by statute or custom, some regulations on the subject suited to the views of policy that there prevailed. After slaves had been brought to South Carolina, the first probably brought from Barbadoes in 1671, so far as our public documents now show, they were for nearly twenty years unnoticed in any legislative Act; but still the rights of masters and some mode of emancipation were acknowledged and prevailed, as subsequent statutes show. In 1690, when the first Act (7 Stat. 343) concerning slaves was adopted which our statute book now exhibits, it was enacted that no slave shall be free by becoming a Christian ; that for payment of the debts of a decedent, slaves shall be deemed and taken as goods and chattels, but in all other cases whatsoever shall be accounted as freehold, and descend accordingly; and that a slave shall have the whole benefit of a reward for apprehending a runaway, to be laid out in chattels or otherwise at the discretion of the owner. An Act of 1708, (7 Stat. 350, § 5,) provides for slaves “ having and enjoying freedom” for certain services to the public. In 1712, (7 *99 Stat. 352) special “ constitutions, laws and orders,” different from the “laws, customs and practices” of the province, were enacted for “ negroes and other slaves” who were of “barbarous, wild and savage natures.” By these they and their children are declared “slaves to all intents and purposes,” except those who had been or should be, for some merit, made and declared free, either by the Governor and Council, “ or by their respective owners or masters.” The master’s right to receive “ the whole of what a slave shall earn” is taken for granted and enforced, (7 Stat. 363, § 28;) and whilst the lawfulness of a negro’s professing the Christian faith and being baptized is set forth, it is declared that he shall not thereby be manumitted or set free. The popular opinion, proceeding from tradition of ancient law, superstition and intolerance, was thus corrected for the benefit of the slave and the security of the master, and done by an authority as potent as that which established the doctrine of perpetuus inimicus. Various other Acts of legislation regulating slaves (in which are contained prohibitions of their acquiring property for their own benefit, and implied recognition of their ability to become free and to receive small gratuitous rewards) were made between 1712 and 1740. In 1740 a more comprehensive code for slaves than before existed was provided. (7 Stat. 397.) All negroes, (those now free excepted,) with their offspring, are declared to be “ absolute slaves,” to follow the condition of the mother, and to “ be adjudged in law to be chattels personal in the hands of their owmers,” executors, &e., “to all intents, constructions and purposes whatsoever;” which provision as to chattels seems to have been intended to make slaves in all cases personal property, in abrogation of the Act of 1690, which, in all cases but one, had made them real estate. The Act of 1740 directs a mode of trying a question of freedom claimed by a negro; but neither that, nor any other Act prior to 1800, fixed a *100 form of emancipation ; and in this it may be seen how influential usage was in the regulating of negroes. Some provisions which are made in the Act of 1710, and other Acts before and after that, mostly prohibitory, show a recognition of the ability of a slave to acquire articles of personal property, and of the right of the master to dispose of such articles in the possession of his slave.
By the legislation of the Province and State, the status of the negro was fixed. It was not that of alien enemy, but of a native, resident human being, of a race deemed inferior; when a slave, subject to tbe absolute control of a master, wherever the latter was not restrained by law ; having no power to contract, nor standing in any Court, under bis own name, but protected, so far as the law afforded any protection, by the intervention of his master or some public authority; under all disability which bad not been removed, and concerning property especially, .incapable of holding, except by the consent and for the benefit of the master; even when emancipated from the dominion of a master, incapable of testifying, (except upon tbe trial of one of his own race before an inferior tribunal,) (State vs. Scott, 1 Bail. 270; State vs. Davis, 2 Bail. 558,) of becoming a citizen, or of discharging any function which pertained to government, although protected in person, invested with full rights as to the acquisition and bolding of property, real and personal, and entitled to sue and be sued in all Courts. (Groning vs. Derana, 2 Bail. 192; White vs. Henery, 1 McC. 429.) Toward the negro slave, the master stood as the sovereign did toward the alien enemy, with more summary powers — powers even greater than those of the lord of the manor over his villein ; for although the lord could seize and appropriate whatever real or personal property the villein purchased, whilst it was in the villein’s possession, an alienation by the villein before the lord’s seizure deprived the lord of his right, (Co. Litt. 117,) whereas title *101 in the master once vested by tbe slave’s rightful possession was not affected by any subsequent transfer made by the slave. (Hobnor vs. Perry, 2 Hill, 277.)
Decisions of Courts in tbe Province wore no doubt conformable to the legislation and usage theu existing, but we have no reports of cases prior to tbe Revolution. In 1792, in a case (Guardian of Sally vs. Beaty, 1 Bay, 260) where feelings of generous humanity and natural justice were strongly excited in behalf of a negro girl who had been purchased by tbe surplus earnings of an old woman slave and had been -manumitted by her, Chief Justice Rutledge set forth the claims of the girl so strongly, that a jury rendered a verdict in her favor, in opposition to the old woman’s master, who asserted his right to all the acquisitions of his slave. But that no change of law was wrought by this verdict, appears from a case decided by Chancellor DeSaussure in 1812, (Walker vs. Bostick, 4 Des. 266,) where holding that slaves could' take neither by descent nor purchase, he decreed that real and personal property devised and bequeathed to trustees for tb§ benefit of Betsy, a slave, and her children, fell into the residue of the estate. Many cases are to be found where the master’s right to the slave’s acquisitions of personalty in possession have been sustained, (Gregg vs. Thompson, 2 Mill, 331; Gist vs. Toohey, 2 Rich. 424; Peay vs. McEwin, 8 Rich. 31;) and tbe slave’s ability to make acquisitions being thus recognized, the rights of slave, master, executor and next of kin of testator were presented in argument before tbe Court in a case where a legacy to a slave was directly given. That case was Fable vs. Brown, (2 Hill, Ch. 379,) decided in 1835. There it was held that the next of kin were excluded by tbe legacy; that the mistress of the slave was not before the Court; that neither master nor slave could maintain an action against tbe executor for the legacy, any more than either could enforce any right under a bond or note given *102 to a slave, or under any executory contract made with a slave, although the master might maintain an action against a stranger for chattels acquired by his slave; and the executor was left in possession of the legacy, which was held not to be void, and as to which Chancellor Harper says: “I do not say what the effect would be, if the executor should think proper of his own accord to pay over the legacy to the slaves, or their master; but remaining in his hands, it is subject to the claim of the State.” The bill filed by tbe next of kin was dismissed. Eully acquiescing in the result of the case, and in all of the rulings made in it, we have made an effort to assail the opinion that the State had any rights, and the application to the negro of the doctrine of alien enemy, upon which that opinion of Chancellor Harper was founded. The opinion and the doctrine were unnecessary to the decision of the case, and has no other authority than that which must always attend the conclusions of an eminent jurist.
Our legislation contains no implied recognition of the right of a slave to acquire title to real property, as it does of personal. The cases concerning realty claimed by slaves have been few, and are not decisive. In Bowers vs. Newman, (2 McMul. L. 472,) the devise of land and freedom was supported by forty-eight years’ possession, which the devisee had held as a free person of color, and in Hardcastle vs. Porcher, (Harp. L. 496,) the free person of color had never been a slave. In McLeich vs. Burch, (3 Strob. Eq. 225,) an interest in a lot of land was involved, but it was held that the title was in the executors, and that the directions in behalf of the slaves were merely recommendatory. Even in Fable vs. Brown, where the residue bequeathed contained land, there was a direction for the executors to sell the real estate, invest the proceeds in stock, and pay the dividends to the slaves; and notwithstanding remarks concerning the rights of slave, master and the State to land *103 which had been conveyed to a slave, the case seems to have been considered as one involving only a legacy of money into which land had been converted. In this condition of the cases, we doubt not that the possession of land held by a slave should be considered to have been the possession of the master; but we doubt much that a conveyance of land to a slave would have been, ipso facto, a conveyance to the master. Much more than a difference in value, the difference in the modes of transfer required by law, creates a distinction between land and chattels. When the title does not proceed from possession itself, land must be conveyed by writing in due form. Can a conveyance to Cudjo be held to be a conveyance to John Smith, made effectual by proof that John Smith was the master of Oudjo, as a conveyance to an ancestor would avail his heir upon proof of his heirship? Where possession attends or follows the conveyance, the conveyance being the act of the grantor therein, may bar all rights of himself and those claiming under him, and the possession of the slave thereunder give to the master the advantage of party in possession; but where an opposing claim sustained by possession must be overcome, before the conveyance to the slave can be completed by enjoyment, it may well be considered that the conveyance was a mere executory contract with a slave, which neither he nor his master can any more enforce than they could compel payment of a note or legacy to the slave.
In the ease before us the disposition in favor of the slaves, made by Martin Staggers’ will, was at most only of a remainder in land and money. If the remainder was vested, the vested interest passed instantly to the persons who, at the execution of the will, were entitled to be masters of the slaves at the expiration of the life-estate of William Staggers; or else it was a right to a thing not in possession, which neither master nor slave could enforce. *104 The latter alternative applies to it, if it was a contingent remainder, under any view which, with the help of the doctrine of executory devises and bequests, can be taken of it. William Staggers having died before the slaves were emancipated, the fee expectant claimed by them was necessarily defeated.
It is the opinion of the Court that the complainants can recover nothing under the will of Martin Staggers, and the decree, dismissing their bill without costs, is affirmed.
Dunkin, C. J., and Inglis, A. J., concurred.

Motion dismissed.